J-S31031-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF:  Z.M.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF:  J.A.M.S., MOTHER | : | No. 428 EDA 2018 |

Appeal from the Decree January 10, 2018
In the Court of Common Pleas of Lehigh County Orphans' Court at No(s):
A2017-0029

BEFORE:  SHOGAN, J., LAZARUS, J., and DUBOW, J.

MEMORANDUM BY DUBOW, J.:                    **FILED AUGUST 08, 2018**

J.A.M.S. ("Mother") appeals from the decree entered January 10, 2018, in the Court of Common Pleas of Lehigh County, which involuntarily terminated her parental rights to her minor daughter, Z.M.S. ("Child"), born in September 2011.[1]  Because our review of the record supports the findings and conclusions of the orphans' court, we affirm.

**SUMMARY OF FACTS AND PROCEDURAL HISTORY**

Child first came to the attention of the Lehigh County Office of Children and Youth Services ("CYS") when she was three years old after it received a referral indicating that police officers discovered Child wandering the streets without adult supervision.  N.T., 9/25/17, at 14.  Later, CYS discovered that Mother's boyfriend was a Tier III Megan's Law offender.  **Id.**  CYS put a safety

---

[1] In its decree, the orphans' court indicated that it entered a separate decree that same day confirming the consent of Child's father, D.H, to relinquish his parental rights. See Decree, 1/10/18, at 2 n. (citing Adjudication, 1/10/18).

plan in place, which prohibited Mother's boyfriend from having unsupervised contact with Child.  ***Id.***  This included a provision prohibiting Mother's boyfriend from spending the night at her home.  ***Id.*** at 15.  Mother violated the safety plan almost immediately, by allowing her boyfriend to spend the night that very evening.  ***Id.*** at 14-15.  The juvenile court entered an order for emergency protective custody on July 15, 2015, and adjudicated Child dependent on September 29, 2015.

On June 19, 2017, CYS filed a petition to terminate Mother's parental rights to Child involuntarily.  The orphans' court conducted a hearing September 25, 2017.[2]  Following the hearing, on January 10, 2018, the court entered a decree terminating Mother's parental rights.  Mother timely filed a notice of appeal on January 29, 2018, along with a concise statement of errors complained of on appeal.

**ISSUES ON APPEAL**

Mother now raises the following claims for our review:

I. Did the [orphans'] court commit an error of law or abuse of discretion in its determination that [CYS] sustained its burden of proof by clear and convincing evidence that the statutory standards set forth in 23 Pa. C.S.A. §2511(a)(1), (2), (5) and (8) had been met?

II. Did the [orphans'] court commit an error of law or abuse of discretion in its determination that [CYS] sustained its burden of proof by clear and convincing evidence that the termination of

---

[2] During the hearing, Michael E. Moyer, Esquire, served as Child's legal counsel and guardian *ad litem*.  In an order entered June 29, 2017, the orphans' court found that there did not appear to be any conflict between Child's legal interests and best interests.

parental rights best meets the developmental, physical and emotional needs and welfare of the child as required by 23 Pa. C.S.A. §2511(b)?

Mother' Brief at 4 (suggested answers omitted).

**LEGAL ANALYSIS**

We review a decree terminating parental rights involuntarily in accordance with the following standard:

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Section 2511 of the Adoption Act, 23 Pa.C.S. § 2511, governs involuntary termination of parental rights. It requires a bifurcated analysis:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between

parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, the orphans' court terminated Mother's parental rights pursuant to Section 2511(a)(1), (2), (5), (8), and (b). We need only agree with the court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004). Here, we analyze the court's decision to terminate under Section 2511(a)(2) and (b), which provides as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> ***
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> ***
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein

which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2), (b).

**Termination Pursuant to Section 2511(a)(2)**

We first address whether the orphans' court abused its discretion by terminating Mother's parental rights pursuant to Section 2511(a)(2):

> In order to terminate parental rights pursuant to 23 Pa.C.S.[] § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

On October 10, 2018, the Orphans' Court granted the Petition to terminate mother's parental rights. The court based its Decree on Mother's failure to comply with nearly all of her court-ordered reunification goals by failing to complete required services. The court expressed concern that Mother focused her energy on maintaining a relationship with an untreated sex offender rather than participating in services. The court particularly emphasized Mother's failure to complete non-offending parenting treatment,

which would have aided her in recognizing and avoiding the threat that this relationship poses to Child. *See* Decree, 1/10/17 (relying on Adjudication, 1/10/17); *see* Adjudication at 15-16.

Mother responds by touting her parenting abilities. Mother's Brief at 13-15. She argues that she was appropriate and caring toward Child during their weekly, one-hour visits together, and that her abilities improved as time went on. *Id.* Mother blames her failure to complete non-offending parenting treatment on the treatment providers and CYS. *Id.* She suggests that she may have been more likely to succeed in non-offending parenting treatment if it emphasized individual rather than group therapy, and included referrals for treatment of her depression and suspected post-traumatic stress disorder. *Id.* at 14-15. Mother maintains that the CYS caseworker spent her time "lying in wait," trying to catch Mother with her boyfriend, rather than addressing Mother's needs and trying to help her. *Id.* at 14.

After a thorough review of the record in this matter, we conclude that the Orphans' court did not abuse its discretion. During the termination hearing, CYS presented the testimony of caseworker, Laura Craig. Ms. Craig testified that the trial court ordered Mother to complete a series of reunification goals. N.T., 9/25/17, at 16. These goals included complying with CYS; cooperating with visitation; participating in Child's medical appointments; working with in-home services; obtaining and maintaining a safe and stable residence and a legal source of income; cooperating with non-offending parenting treatment; and not allowing any contact between her

boyfriend and Child until he successfully completes a sex offender treatment program as confirmed by CYS.  *Id.* at 16, 26.

Ms. Craig testified that Mother complied with at least some of these goals.  Mother attended all of her weekly, one-hour supervised visits with Child and all of Child's medical appointments.  *Id.* at 26.  CYS also referred Mother for in-home services though JusticeWorks.  *Id.* at 27.  JusticeWorks discharged Mother successfully, during a time when she was living with her parents, working at a fast-food restaurant, and attending visits consistently.[3]  *Id.* at 27, 40.

However, Mother failed to comply with the remainder of her goals.  Concerning the goal that Mother obtain and maintain a safe and stable residence, Ms. Craig testified that Mother moved repeatedly.  *Id.* at 20-21.  She explained,

> [Mother] was with her mom and dad at their house.  She has said that she was living in a tent.  She said she was living with a friend that she couldn't get the address to.  Back to her parents.  And then she recently said that she was living in Palmerton, but all of her mail was being returned from Palmerton.  And when I asked her about that, she said that she then did move back with her parents.  So right now, she is staying with her parents.

*Id.*

Mother also failed to complete non-offending parenting treatment.  Ms. Craig testified that Mother began treatment at Confront.  *Id.* at 18.  Confront

---

[3] Ms. Craig testified that Mother obtained "a couple" jobs, including working at the fast-food restaurant, but failed to keep them.  N.T., 9/25/17, at 27, 45-46.

discharged Mother unsuccessfully in January 2016, due to her failure to attend and participate consistently. *Id.* CYS then referred Mother to another program at Forensic Treatment Services ("FTS"). *Id.* FTS discharged Mother unsuccessfully in August 2016, due again to her failure to attend and participate. *Id.* In addition, FTS discharged Mother due to her refusal to acknowledge that she was still in a relationship with her boyfriend. *Id.* at 18, 44. Ms. Craig explained that CYS personnel continued to observe Mother and her boyfriend together, even after Mother claimed that she had ended their relationship. *Id.* at 18-20. Most recently, CYS sent certified mail containing notice of the termination hearing to the boyfriend's home, and Mother signed for the mail.[4] *Id.* at 20.

Ms. Craig further testified that the trial court ordered Mother to complete a psychological evaluation before attempting another round of non-offending parenting treatment. *Id.* at 55. The court ordered Mother to obtain the evaluation in August 2016, but she failed to comply until March 2017. *Id.* at 55-56. Ms. Craig reported that FTS is now willing to accept Mother back for further treatment, but not until she writes the program a letter "saying why her treatment would be different this time." *Id.* Mother claimed to Ms. Craig that she sent FTS a letter "over the summer," but FTS indicates that it has not received it. *Id.* at 56-57.

---

[4] Ms. Craig noted that CYS never received any indication that Mother's boyfriend attended sex offender treatment. N.T., 9/25/17, at 16.

Accordingly, the record confirms that Mother is incapable of parenting Child and she cannot or will not remedy her parental incapacity. Mother failed to maintain safe and stable housing for Child. More critically, Mother remained in a relationship with an untreated sex offender and failed to complete two separate non-offending parenting treatment programs. Mother's suggestion that she may have been more likely to complete treatment if it focused on individual rather than group therapy and included certain referrals is pure speculation and does not warrant reversal of the termination decree. By the time of the hearing in this matter, Child had been in foster care for well over two years, and was in need of permanence and stability. Because it is clear that Mother will not be able to provide that permanence and stability at any point in the foreseeable future, the record supports the findings and conclusions of the orphans' court with respect to Section 2511(a)(2).

**Termination Pursuant to Section 2511(b)**

We next consider whether the orphans' court abused its discretion by terminating Mother's parental rights pursuant to Section 2511(b). We have set forth the requisite analysis as follows:

> Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis,

it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011) (quotation marks and citations omitted).

Our Supreme Court has noted that "[a]s with dependency determinations, we emphasize that the law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular child[ ] involved." *In re T.S.M.*, 71 A.3d 251, 268-69 (Pa. 2013).

This Court recognized in *In re A.D.*, 93 A.3d 888, 897-98 (Pa. Super. 2014), that the "mere existence of an emotional bond does not preclude the termination of parental rights," and that "[t]he court may equally emphasize the safety needs of the child under subsection (b)." *Id*. (citations omitted). "Obviously, attention must be paid to the pain that inevitably results from breaking a child's bond to a biological parent, even if that bond is unhealthy, and we must weigh that injury against the damage that bond may cause if left intact." *In re. T.S.M, supra* at 69.

- 10 -

In the instant case, Mother contends that severing Child's bond with her would cause Child to suffer irreparable harm. Mother's Brief at 18. She maintains that CYS presented only minimal testimony as to the nature and depth of this bond, which was inconclusive at best and irrelevant at worst. *Id.* at 18-19. Mother insists that Child's bond with her is more significant than Child's bond with her foster parents, as evidenced by Child's practice of referring to her as her "real Mommy," and referring to her foster parents as her "pretend Mommies." *Id.* at 19.

The evidence considered by the court pertaining to the Child's bond with Mother included the following. Mother's visitation coach, Shereeann Lewis-McBean, testified that she began supervising Mother's weekly, one-hour visits in April 2016. N.T., 9/25/17, at 94. During the early visits, Mother and Child would spend most of their time eating a snack, and "[t]here wasn't much engaging or anything productive." *Id.* at 96-97. Mother would try to get Child to hug her but Child would resist. *Id.* at 96. Ms. Lewis-McBean reported that Mother is now better at engaging Child during visits and that Mother and Child exhibit signs of bonding. *Id.* at 98. Child will sometimes be reluctant to leave Mother when visits are over and will try to extend visits by beginning new activities. *Id.* at 98-99. Child is also more willing to hug Mother and say, "I love you," at the end of visits, "without [Mother] having to pry it out of her." *Id.* at 99. Ms. Lewis-McBean added that Child seems confused by her circumstances, and questions Mother frequently about "having multiple

Mommies." *Id.* at 99-100, 109. Child refers to Mother as her "real Mommy," and to her foster parents as her "pretend Mommies." *Id.* at 100.

Child's counsel presented the testimony of court-appointed special advocate, Lisa Tejada. Ms. Tejada testified that she observed sixty-five of Mother's visits with Child. *Id.* at 112. Based on her observations, Ms. Tejada did not believe that Mother and Child share a meaningful bond. *Id.* at 113. She explained, "[Child] is reluctant to hug her mom at times. Very reluctant to say I love you. Many times [Mother] will tell [Child] I love you, I love you, quite a few times, and sometimes [Child] would respond and other times she would just leave and not say anything." *Id.* at 113-14. Ms. Tejada recalled that one of Mother's recent visits had to be cancelled, and that Child did not appear to be disappointed or upset. *Id.* at 116.

Ms. Tejada further testified that Child is aware that her foster parents may adopt her, and appears to be looking forward to the adoption. *Id.* at 116. She recalled that she and Ms. Craig (the CYS caseworker) visited Child at her foster home recently, and during the visit, Child asked Ms. Craig whether "she would be able to come back and be at her adoption." *Id.* at 115-16

The Orphans' court resolved the conflicting testimony regarding the Child's bond with Mother by concluding that the Child has "a fairly strong emotional bond" with Mother. Adjudication, 1/10/18, at 19-21. As required by Section 2511(b), the court weighed that conclusion against the Child's need for safety, stability, and security, and determined that termination would best

serve Child's needs and welfare. In reaching its determination, the court weighed the Child's bond with Mother against the damage that the bond may cause to Child if left intact. Specifically, the court emphasized that Mother's failure to comply with reunification services, which included her failure to complete non-offender's parenting treatment, and her maintaining a romantic relationship with a lifetime-registrant child sex offender—a relationship that was the reason for the removal of the Child over two years prior to the hearing—would not serve the safety needs of the Child. The court also considered the positive and beneficial relationship Child has with her foster parents, a pre-adoptive resource, as a factor weighing in favor of termination for the sake of the Child's needs and welfare.

Based on the foregoing, we conclude that the Orphans' court did not abuse its discretion by terminating Mother's parental rights to Child involuntarily. Therefore, we affirm the court's January 10, 2018 decree.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/8/2018